PETITIONERS APPEARING PRO SE:
**MATHEW R. DuSABLON**
**VANESSA A. DuSABLON**
Seymour, IN

ATTORNEYS FOR RESPONDENT:
**CURTIS T. HILL, JR.**
ATTORNEY GENERAL OF INDIANA
**ROBERT A. ROWLETT**
DEPUTY ATTORNEY GENERAL
Indianapolis, IN

FILED

Dec 04 2020, 2:31 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

# IN THE
# INDIANA TAX COURT

|  |  |  |
|---|---|---|
| MATHEW R. DuSABLON and VANESSA A. DuSABLON, | ) ) ) | |
| Petitioners, | ) ) | |
| v. | ) ) | Cause No. 20T-TA-00004 |
| KATIE KAUFMAN, in her official capacity as the JACKSON COUNTY ASSESSOR, | ) ) ) | |
| Respondent. | ) | |

_____

ON APPEAL FROM A FINAL DETERMINATION
OF THE INDIANA BOARD OF TAX REVIEW

**FOR PUBLICATION**
**December 4, 2020**

FISHER, Senior Judge

Mathew R. and Vanessa A. DuSablon have challenged the Indiana Board of Tax Review's final determination valuing their residential property for the 2018 tax year. Upon review, the Court affirms the Indiana Board's final determination.

## FACTS AND PROCEDURAL HISTORY

The DuSablons own a house, and the 10.28 acres of land upon which it sits, just outside of Seymour, Indiana. (See generally Cert. Admin. R. at 1-4.) The DuSablons

purchased their property in December of 2014 for $380,000. (See Cert. Admin. R. at 3, 37, 125, 127-28.)

For the 2018 tax year, the DuSablons' property was assessed at $372,000 ($28,500 for land and $343,500 for improvements). (See Cert. Admin. R. at 2.) The DuSablons appealed the assessment to the Jackson County Property Tax Assessment Board of Appeals ("PTABOA"). On December 11, 2018, the PTABOA reduced the assessment to $364,300 ($28,500 for land and $335,800 for improvements). (See Cert. Admin. R. at 2-3.) Still dissatisfied, the DuSablons sought review with the Indiana Board.

The Indiana Board held a hearing on the DuSablons' appeal on September 18, 2019. During the hearing, the Jackson County Assessor conceded that she bore the burden of proving that the DuSablons' assessment was correct because it had increased by more than 5% between 2017 and 2018.[1] (See Cert. Admin. R. at 96.) (See also Cert. Admin. R. at 3 (indicating that in 2017, the assessed value of the DuSablons' property was $318,700 ($30,500 for the land and $288,200 for the improvements).) To meet her burden, the Assessor presented an appraisal report, along with the testimony of its preparer, Richard Borges, an Indiana certified general appraiser and member of the Appraisal Institute. (See Cert. Admin. R. at 55-74, 103-06.) The appraisal report, completed in conformance with the Uniform Standards of Professional Appraisal Practice

---

[1] Pursuant to Indiana Code § 6-1.1-15-17.2, commonly referred to as "the burden-shifting statute," if an assessment of property increases by more than 5% from one year to the next, the assessor bears the burden of proving that the assessment is correct. See IND. CODE § 6-1.1-15-17.2 (2019); Orange Cnty. Assessor v. Stout, 996 N.E.2d 871, 873 (Ind. Tax Ct. 2013). See also Nova Tube Indiana II LLC v. Clark Cnty. Assessor, 101 N.E.3d 887, 893 n.5 (Ind. Tax Ct. 2018) (explaining that for purposes of the burden-shifting rule, the term "burden of proof" refers to the burden of production).

2

("USPAP"), estimated the value of the DuSablons' property to be $400,000 as of January 1, 2018. (See Cert. Admin. R. at 56, 60.) Borges explained that he arrived at this value using a sales comparison approach that evaluated the sales of three comparable properties near the subject property. (See, e.g., Cert. Admin. R. at 60, 64-65, 74, 104-05.)

In rebuttal, the DuSablons argued that their assessment was the product of bias because:

1) for years they have had to contact the Assessor to correct mistakes on the property record card;

2) no improvements have been made to their property that justified any assessment increase, let alone one of 17%;

3) they presented – but the PTABOA ignored – the property record cards of three properties that were better than theirs, but assessed for less;

4) when the PTABOA reduced their assessment, much of the form it used was incomplete;

5) the comparables that Borges used in his appraisal were not comparable.

(See Cert. Admin. R. at 113-18, 129-30.) In conjunction with their argument, the DuSablons presented the Indiana Board with copies of seven property record cards: one for their property, three for the properties that Borges used as comparables in his appraisal report, and three for properties that they claimed were better comparables but were assessed for less. (See Cert. Admin. R. at 36-44, 49-54, 114-16.) The DuSablons also presented a copy of the PTABOA's Form 115 that reduced their assessment from $372,000 to $364,300. (See Cert. Admin. R. at 36, 45-48.)

On December 16, 2019, the Indiana Board issued a final determination upholding

3

the assessment of the DuSablons' property. In its final determination, the Indiana Board found that the Assessor's appraisal used "a generally accepted valuation methodology – the sales comparison approach – to estimate the [DuSablons'] property[] value as of the relevant . . . valuation date. [Borges] explained why the properties he used [in that approach] were comparable to the DuSablons' property, and he adjusted their sales prices to account for relevant differences." (Cert. Admin. R. at 89 ¶ 23.) The DuSablons' response to this evidence, the Indiana Board explained, were mere assertions that they disagreed with Borges' adjustments and that their comparables were better than his. (See Cert. Admin. R. at 89-90 ¶¶ 24, 26.) Moreover, the Indiana Board continued, the DuSablons failed to present any evidence to show what they believed the proper valuation of their property should be. (Cert. Admin. R. at 89-90 ¶ 25.) As a result, the Indiana Board held that the DuSablons failed to impeach the Assessor's appraisal and upheld the PTABOA's assessment. (Cert. Admin. R. at 89 ¶¶ 23-24.)

The DuSablons subsequently initiated an original tax appeal. The Court took the matter under advisement on October 2, 2020, after all briefing was complete. Additional facts will be supplied when necessary.

**STANDARD OF REVIEW**

The party seeking to overturn an Indiana Board final determination bears the burden of demonstrating its invalidity. Osolo Twp. Assessor v. Elkhart Maple Lane Assocs., 789 N.E.2d 109, 111 (Ind. Tax Ct. 2003). Thus, to prevail in their appeal, the DuSablons must demonstrate to the Court that the Indiana Board's final determination is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege or immunity; in excess of or short of

4

statutory jurisdiction, authority, or limitations; without observance of the procedure required by law; or unsupported by substantial or reliable evidence.  See IND. CODE § 33-26-6-6(e)(1)-(5) (2020).

**ANALYSIS**

On appeal, the DuSablons describe themselves as the victims of an abusive assessment system that has been fraught with invasive property inspections, governmental failures to follow protocol, and smear campaigns designed to taint their reputations.  (See, e.g., Pet'rs' Resp. Resp't Br. ("Pet'rs' Reply Br.") at 2-3 ¶¶ 3-5, 11 ¶ 11.)  In order to distill the DuSablons' numerous complaints about the system into a productive discussion regarding the assessment of their property, the Court restates the issues on appeal as whether the DuSablons:  1) successfully discredited Borges and his appraisal report and 2) provided their own probative evidence that would support a reduction to their property's assessment.

**1. CREDIBILITY**

a. <u>Borges' Personal Credibility</u>

The DuSablons first claim that they "efficaciously eroded all of Borges' credibility" as a witness when they elicited testimony from him during the Indiana Board hearing that "he received personal tax relief from the [Assessor] for the same tax year and in the same county[.]"  (Pet'rs' Reply Br. at 9 ¶ 6(k)(i).)  Accordingly, they contend that the Indiana Board should have deemed his testimonial presentation and appraisal report "'null and void at the moment of [his] unethical exposure'" and that now, on appeal, the Court "has no ethical option but to side in [their] favor[.]"  (See Pet'rs' Reply Br. at 9 ¶ 6(k)(iii), 12 at

5

¶ 16.) (See also Pet'rs' Reply Br. at 9 ¶ 6(k)(iv) (contending that the Indiana Board should have "see[n] Borges for what he really is").)

The DuSablons' claim is an explicit request for the Court to reassess Borges' credibility as a witness. The Court must refrain from doing so, however, absent an abuse of discretion. Southlake Indiana, LLC v. Lake Cnty. Assessor, 135 N.E.3d 692, 696 (Ind. Tax Ct. 2019) (explaining that when reviewing Indiana Board final determinations on appeal, the Court "may not reweigh or assess the credibility of evidence absent finding an abuse of discretion"), review denied. To demonstrate an abuse of discretion, the DuSablons must show the Court that in finding Borges to be a credible witness, the Indiana Board acted either against the logic and effect of the facts and circumstances before it or in contravention of the law. See Kooshtard Prop. I, LLC v. Monroe Cnty. Assessor, 38 N.E.3d 750, 753 (Ind. Tax Ct. 2015). The DuSablons have done neither.

During the Indiana Board hearing, the entire exchange between the DuSablons and Borges regarding his qualifications as a witness was as follows:

> Q [by the DuSablons]: Have you ever had to appeal a property tax assessment that you personally, or any of your businesses or associated with in Jackson County?
>
> A [by Borges]: Yes.
>
> Q: Would you say one or more?
>
> A: I . . . I think two. I, one that my wife and I owned, and then another I did an appeal for my mother on a property . . . maybe 15 years ago.
>
> Q: So only two since 1974 [sic.]?
>
> A: Are you asking about properties with which I am personally connected somehow or [for] a client?
>
> Q: For any of your businesses.

Q: Any business associations, any financial interest.

A: I have, I handled appeals as a tax representative for other parties, who are my clients, and I have done appraisals for assessors and for property owners related to assessment appeal cases, but the two that I mentioned are the two that are properties with which I had some sort of personal interest in Jackson County.

Q: So, in those instances, did you have favorable tax relief?

A: Yes.

Q: Can you recall by how much?

A: I don't really have a good recall of the one that I did for my mother a long time ago. The one within the last year was maybe about, about $30,000.

(Cert. Admin. R. at 107.) The DuSablons, however, never objected to Borges' having been called as a witness nor did they provide the Indiana Board with any explanation why Borges' two successful property tax appeals over the course of the last fifteen years destroyed his credibility as an appraisal witness in their case. (See Cert. Admin. R. at 108-30.) In fact, it was only in their briefing to this Court that the DuSablons actually even articulated an allegation that Borges was biased and not a credible witness. (Compare Cert. Admin. R. with Pet'rs' Br. and Pet'rs' Reply Br.)

From that briefing, it appears that the DuSablons are alleging that because Borges got a favorable reduction on his own assessments he was compelled to "return the favor" and help the Assessor get a higher value on the DuSablons' property. (See Pet'rs' Reply Br. at 11 ¶ 15 (stating that the Assessor "had [Borges] on the hook to manipulate the data in [her] favor").) Without anything more, however, the DuSablons' allegation that Borges was biased and therefore not credible remains a mere allegation. See, e.g., Miller Structures, Inc. v. Indiana State Bd. of Tax Comm'rs, 748 N.E.2d 943, 949 (Ind. Tax Ct.

2001) (explaining that bare assertions and allegations do not constitute evidence). Cf. Wirth v. State Bd. of Tax Comm'rs, 613 N.E.2d 874, 877 (Ind. Tax Ct. 1993) (explaining that while an expert's compensation may affect the credibility of his testimony, it does not affect the admissibility of his testimony). Consequently, the DuSablons have not demonstrated to the Court that the Indiana Board acted against the logic of the facts and circumstances before it when it concluded that Borges was a credible witness.

Moreover, the DuSablons have not shown the Court that the Indiana Board contravened any law when it determined that Borges was a credible witness. Indeed, they have not pointed to any law or authoritative source that would support their allegation that Borges was prohibited from appraising their property or from testifying about his appraisal. (See generally Cert. Admin. R.; Pet'rs' Br.; Pet'rs' Reply Br.) This failure is fatal to their claim.

The DuSablons have not demonstrated to the Court that they successfully discredited Borges as an appraiser. Accordingly, the Court will not reverse the Indiana Board's final determination on this basis.

b.        The Credibility of Borges' Appraisal Report

Alternatively, the DuSablons contend that they successfully discredited Borges' appraisal report on two separate grounds. First, they explain that they demonstrated that Borges erroneously described certain physical aspects of their property. (See Pet'rs' Reply Br. at 5 ¶ 6(a)-(e).) Second, they explain that they demonstrated that the three properties Borges used as comparables in his appraisal report were not comparable to their property. (See Pet'rs' Reply Br. at 5-8 ¶ 6(f)-(i).)

8

## i) The Physical Aspects of the Property

The DuSablons first assert that during the Indiana Board hearing, they successfully discredited Borges' appraisal report because they demonstrated that he improperly:

designated their home as "larger than typical";

listed their pole barn as having a manual, not a machine-powered, garage door opener;

included their two wooden sheds because they are non-permanent structures and have no value;

identified space in the basement as a "kitchen" even though it is not a kitchen because there is no stove, microwave, or hot-plate;

failed to identify the property's three hot water heaters as being part of its geothermal system; and

described the home as superior with above-standard construction characteristics "when it is truly sub-par to average, especially [because] the home's finishes are not to standard for the current market. For example, the kitchen cabinets need redone, wood floor is showing significant wear and needs refinished, several windows and the roof need replaced, and the bathrooms need updated severely."

(See Pet'rs' Reply Br. at 5 ¶ 6(a)-(e).) As a result, they argue that the Indiana Board erred in giving the Borges' appraisal report any weight. (See Pet'rs' Reply Br. at 5 ¶ 6.) The Court does not find the DuSablons' argument persuasive for the following two reasons.

First, in their examination of Borges during the Indiana Board hearing, the DuSablons did not demonstrate that Borges was wrong; rather, they demonstrated that, for the most part, they either did not understand his appraisal descriptions or that they simply disagreed with them.[2] For example, at one point during their questioning of

---

[2] Borges admitted, however, that he did misidentify the type of garage door opener. (See Cert. Admin. R. at 108.) But see Marion Cnty. Assessor v. Washington Square Mall, LLC, 46 N.E.3d 1, 11-12 (Ind. Tax Ct. 2018) (explaining that even when an appraisal contains errors or flaws, the appraisal is not necessarily rendered invalid).

Borges, the DuSablons indicated that "it was [not] the case" that their house was "larger than typical." (See Cert. Admin. R. at 108.) Borges responded, however, that that description as used in the appraisal report was not applied to the house but rather to their 10-acre land site. (See Cert. Admin. R. at 108.) In another example, the DuSablons argued with Borges, asserting that he should not have included their sheds in his appraisal report because they were "non-permanent" structures with no value; Borges responded, however, whether or not the sheds were permanently affixed to the ground was irrelevant for purposes of the appraisal: they must still be listed and accounted for because they "are there and in place[.]" (See Cert. Admin. R. at 108-09.)

Which segues into the second reason why the DuSablons' argument fails. Borges explained in both his appraisal report and through his testimony that most of these individual physical features had little if any effect on his valuation of the DuSablons' property. (See, e.g., Cert. Admin. R. at 63 (stating that the sheds "add little utility or value"), 108-09 (explaining that the sheds' contribution to value was "insignificant"), 109-10 (explaining that even when listed as part of the home's geothermal system, the three water heaters did not contribute to the property's value).) Instead, he explained, his valuation of their property was a function of what the property overall would sell for in an arm's length transaction. (See, e.g., Cert. Admin. R. at 60, 104.)

The DuSablons have not demonstrated to the Court that they discredited Borges' appraisal report simply because of the way he described or listed their property. Accordingly, the Court will not reverse the Indiana Board's final determination on this basis.

## ii) Borges' Comparables

Next, the DuSablons assert that they successfully discredited Borges' appraisal report by demonstrating that the properties he relied on in his sales comparison approach were not truly comparable to their property. (See Pet'rs' Reply Br. at 5-8 ¶ 6(f)-(i).) The Court does not find this argument persuasive.

In his appraisal report, Borges estimated the value of the DuSablons' property to be $400,000 based on the sales of three nearby properties. (See Cert. Admin. R. at 60, 64 (indicating that two of the properties were less than 2 miles away and the third was 7.2 miles away).) Borges deemed the data from those sales relevant to the value of the DuSablons' property because they 1) all had rural acreage outside Seymour; 2) were served by the same public school system and were subject to similar, if not the same, tax rates; and 3) sold within 6 months of the January 1, 2018, assessment date. (See Cert. Admin. R. at 64, 105.) Borges then made both positive and negative adjustments to each of the three properties' sales prices, which ranged from $247,500 to $419,000, to account for their differences from the DuSablons' property with respect to certain characteristics, including: total acreage, age and condition of improvements, square footage of the improvements, number of bathrooms, finishes, and presence of basements.[3] (See Cert. Admin. R. at 64, 105.) This methodology is consistent with generally accepted appraisal practices. See generally 2011 REAL PROPERTY ASSESSMENT MANUAL ("Manual")

---

[3] For example, one of the properties Borges used as a comparable had 6.30 acres of land in comparison to the DuSablons' 10.28 acres. (See Cert. Admin. R. at 64.) Accordingly, Borges adjusted the sales price of the comparable property by a positive $20,000 to account for the difference in acreage. (See Cert. Admin. R. at 64.) Stated differently, Borges expected that if the comparable had 10.28 acres like the DuSablon property, it would have sold for an additional $20,000. It appears from the administrative record that the DuSablons did not understand how these adjustments worked within the context of the appraisal. (See Cert. Admin. R. at 123; Pet'rs' Br. at 5-8 ¶¶ 6(f)-(h).)

11

(incorporated by reference at 50 IND. ADMIN. CODE 2.4-1-2 (2011)) at 2; Appraisal Institute, THE APPRAISAL OF REAL ESTATE 377-95 (14th ed. 2013).

In their brief, the DuSablons have provided the Court with approximately three pages of specific reasons why Borges' choice of comparables and subsequent adjustments thereto were either "not logical," "skewed," "inherently flawed," "lackadaisical," or "unacceptable." (See Pet'rs' Reply Br. at 5-8 ¶¶ 6(f)-(h).) The Court notes, however, that the DuSablons made no such arguments during the Indiana Board hearing.[4] (Compare Pet'rs' Reply Br. at 5-8 ¶¶ 6(f)-(h) with Cert. Admin. R. at 95-130.) Consequently, the DuSablons have not demonstrated to the Court that they successfully discredited Borges' appraisal report on the basis that the properties he used as comparables were not comparable to their property. The Court will not reverse the Indiana Board's final determination on this basis.

## 2. THE DUSABLONS' INDEPENDENT EVIDENTIARY PRESENTATION

The Court now turns to what the DuSablons presented as their case-in-chief. Specifically, the Court will address the DuSablons' "main" arguments and their presentation of the property record cards of six other properties.

a. The DuSablons' Main Arguments & Evidence of Market Value-in-Exchange

As earlier indicated, the DuSablons' assessment increased from $318,700 in 2017 to $364,300 in 2018. The DuSablons argue that because no improvements were made to the property between 2017 and 2018, there was no basis for a change in their property's assessment. (See Cert. Admin. R. at 113; Pet'rs' Reply Br. at 1 ¶ 2 (stating

_____

[4] Instead, the DuSablons argued that the assessed values of the properties that Borges used as comparables were much lower than their sales prices. (See Cert. Admin. R. at 49-54, 64, 117-18.) The Court will address this argument later in the opinion.

12

that "the main issue that [we] have sought diligently for an answer to since early 2018 [but to] no avail[: h]ow can [we] experience a $45,600 increase in [our] property's assessed value with no added improvements over the course of the year[?]").)

A property's assessed value, however, does not change solely on the basis of physical changes to the property. Rather, it can fluctuate each year for a variety of reasons, including factors extrinsic to the property. See Marion Cnty. Assessor v. Washington Square Mall, LLC, 46 N.E.3d 1, 11 (Ind. Tax Ct. 2015) (stating that "[i]n the world of property assessment, property values fluctuate annually with changes in the market" (citation omitted)).) And sometimes, a property's assessed value may change in order to correct mistakes that were made in its assessment that resulted in an undervaluation. See, e.g., Allport v. Fulton Cnty. Assessor, 919 N.E.2d 1251, 1253 (Ind. Tax Ct. 2010). Accordingly, the fact that the DuSablons' property may not have physically changed between 2017 and 2018 does not mean that its value remained the same.[5]

In Indiana, real property is assessed on the basis of its market value-in-use. IND. CODE § 6-1.1-31-6(c) (2020); Manual at 2. In markets where regular exchanges occur and ask and offer prices converge – e.g., the residential housing market – market value-in-use typically equals value-in-exchange. Manual at 2. See also Millennium Real Estate Inv., LLC v. Assessor, Benton Cnty., 979 N.E.2d 192, 196 (Ind. Tax Ct. 2012) (explaining that a property's market value-in-use is, in such instances, the "'most probable price (in

---

[5] Moreover, as the Court has often noted, each assessment year stands alone. See, e.g., Fleet Supply, Inc. v. State Bd. of Tax Comm'rs, 747 N.E.2d 645, 650 (Ind. Tax Ct. 2001), review denied; Barth, Inc. v. State Bd. of Tax Comm'rs, 699 N.E.2d 800, 805 n.14 (Ind. Tax Ct. 1998) (explaining that "[w]here a taxpayer challenges an assessment, the resolution of that challenge does not depend on how the property was previously assessed").

terms of money) which [the] property should bring in a competitive and open market under all conditions requisite to a fair sale'"), review denied.

Once the Assessor presented probative evidence in this case that supported her assessment increase, the DuSablons needed to do more in their rebuttal than complain that the method by which both the assessment and the appraisal were computed was incorrect. See, e.g., Hurricane Food, Inc. v. White River Twp. Assessor, 836 N.E.2d 1069, 1074 (Ind. Tax Ct. 2005) (explaining that even if the method used by an assessing official to value property is incorrect, the assessment will not necessarily be invalidated if other probative evidence indicates that the property's assessed value accurately reflects its market value-in-use). Indeed, they needed to present their own objectively verifiable evidence that provided an estimate of their property's market value-in-exchange. See, e.g., Westfield Golf Practice Ctr. v. Washington Twp. Assessor, 859 N.E.2d 396, 399 (Ind. Tax Ct. 2007); O'Donnell v. Dep't of Local Gov't Fin., 854 N.E.2d 90, 93-94 (Ind. Tax Ct. 2006); Eckerling v. Wayne Twp. Assessor, 841 N.E.2d 674, 677 (Ind. Tax Ct. 2006). They did not; instead, they merely asserted that they overpaid for their property "because we were tired of looking, and we were currently living [with Vanessa's parents] with three children under the age of four." (Cert. Admin. R. at 125.) (See also Cert. Admin. R. at 118 (claiming that "sales price is not always a true representation of fair market value").) In their presentation to the Court, the DuSablons argue that "just because an individual chooses to overpay for [her] property due to personal reasons and desires does not mean the [purchase price should represent the market] value of that property[.]" (See Pet'rs' Reply Br. at 9 ¶ 6(j).)

The DuSablons have missed the point. Taxpayers and assessing officials alike must rely on <u>objectively verifiable data</u> to support their valuation positions. The objectively verifiable evidence in this case demonstrates that the DuSablons paid $380,000 for their property in 2014. (<u>See</u> Cert. Admin. R. at 3, 37, 125, 127-28.) The DuSablons' assessment is consistent with that evidence. Because the DuSablons have neither demonstrated that the purchase of their property was consummated in something other than an open, competitive, fair, arm's length transaction, <u>see</u> <u>Millennium</u>, 979 N.E.2d at 196 n.3, or that the value of their property was something other than $380,000, the Court cannot find that their assessment was improper.

b.     <u>The DuSablons' Presentation of Property Record Cards and the Implication of a Uniformity in Assessment Issue</u>

During the Indiana Board hearing, the DuSablons presented the property record cards for seven properties: theirs, the three that were used by Borges in his appraisal report, and three others. (<u>See</u> Cert. Admin. R. at 36-44, 49-54, 64.) In presenting this evidence, the DuSablons' argued that: 1) three of those properties were better than theirs, but assessed for less; and 2) four of the properties were assessed for less than their recent recorded sales prices. (<u>See</u> <u>generally</u> Cert. Admin. R. at 112-18.)

<u>i) Better Comparables</u>

The DuSablons presented the Indiana Board with copies of three property record cards, contending not only that they would have been better comparables than those used by Borges in his appraisal report because they were closer to their property but also that they demonstrated that more desirable properties were assessed for less than theirs. (<u>See</u>, <u>e.g.</u>, Cert. Admin. R. at 114.) As the DuSablons explained to the Indiana Board:

15

this [first] property [which was assessed for $332,800] has significant improvements to it, and [we're] gonna give you some examples, but they're not limited to these, such as a permanent outbuilding, a pergola, paved sidewalks, large paved patios, large paved driveway, pool, large pool house, and . . . the list goes on and on. Those are just a few examples. And we, on the other hand, do not have any of those kind of improvements the nature of which are located at this property. And then if we move on to the next [property] . . . [its] assessment [was] $287,100 . . . [b]ut the area for the land . . . is roughly the same [as ours]. . . . And this home, as well, has more exterior finishes than ours. Alright, then if we move to [the third property]. . . . This particular property was assessed at $260,100. Also it is extremely immaculate. I don't know if you've been inside this home or not, but it has double mirrored interior staircases, a complete chef's kitchen, [and] a utility room with every possible amenity that you could think of under the sun.

(Cert. Admin. R. at 114.) Now, on appeal, the DuSablons argue that the Indiana Board erred when it simply "disregarded" this evidence. (See Pet'rs' Reply Br. at 2-3 ¶ 5.)

At the outset, the Court notes that two of these properties could not have even been used by Borges as comparables in his appraisal report because they had not been sold. (See Cert. Admin. R. at 36, 41-44.) The whole point of a sales comparison approach is to "estimate[] the total value of [a] property directly by comparing it to similar, or comparable, properties that have sold in the market." Manual at 2 (emphasis added).

In addition, when one contends, as the DuSablons have here, that some other property "is better than mine," she is making a subjective conclusion. As earlier indicated, however, an Indiana assessment must rely upon objectively verifiable evidence; thus, the appropriate question becomes "would it sell for more than mine?" See Manual at 2; Millennium, 979 N.E.2d at 196 n.3. That one home has a pool, or another has a chef's kitchen, or a third is immaculate, may or may not play into answering that question. Here, the certified administrative record demonstrates that the DuSablons failed to explain how the market perceives differences like a pool, or a chef's kitchen, as impacting value. (See

16

generally Cert. Admin. R.)  Accordingly, the Indiana Board did not err when it determined that this evidence was not probative.

ii) Uniformity in Assessment

During the Indiana Board hearing, the DuSablons noted that the property record cards for all three of the properties used by Borges as comparables, as well as for one other property, indicated that they were all assessed for much less than their recorded sales prices.  (See, e.g., Cert. Admin. R. at 39, 49, 51, 53, 64, 112-18.)  The Indiana Board interpreted the DuSablons' presentation of this evidence as a "claim for relief based on a lack of uniformity and equality in assessments, although the DuSablons did not phrase it precisely in those terms."  (Cert. Admin. R. at 90 ¶ 27.)  The Indiana Board subsequently rejected that claim, however, finding that pursuant to this Court's opinion in Thorsness v. Porter County Assessor, 3 N.E.3d 49 (Ind. Tax Ct. 2014), the evidence regarding those four properties was insufficient "to show an actionable lack of uniformity and equality or entitle the DuSablons to an equalization adjustment."  (Cert. Admin. R. at 91-92 ¶¶ 29-31.)

From their briefs, it is not readily apparent to the Court whether the DuSablons appeal that finding.  (See Pet'rs' Br.; Pet'rs' Reply Br.)  In the event they are, however, the Court must affirm the Indiana Board's determination.  Indeed, as the Court explained in Thorsness:

> The Department of Local Government Finance (DLGF) – the administrative agency charged with ensuring that Indiana's property assessments are uniform and equal – has provided guidance about how to compile and evaluate the data necessary for an assessment ratio study [which is the tool used to measure uniformity and equality in assessment].  More specifically, the DLGF has, through its duly promulgated administrative regulations, incorporated into law the

17

> International Association of Assessing Officers' <u>Standard on Ratio Studies</u>.
>
> Pursuant to the <u>Standard</u>, a valid assessment ratio study must be based on data that has been both appropriately stratified and statistically analyzed. For example, the <u>Standard</u> provides that all the properties within the taxing district that fall within the scope of the study must be divided (<u>i.e.,</u> stratified) into two or more subpopulations. The DLGF has determined that for purposes of measuring assessment uniformity in Indiana, assessment ratio studies must stratify properties by property class within each township.
>
> The <u>Standard</u> further explains that a statistical measure of assessment uniformity must be calculated for the entire taxing district and each stratum therein. The most widely accepted statistical measure of tax assessment uniformity is the "coefficient of dispersion," which indicates the average deviation from the median sale/assessment ratio. The DLGF has declared the <u>Standard's</u> coefficient of dispersion to be the yardstick by which assessment uniformity is measured in Indiana's townships.

<u>Thorsness v. Porter Cnty. Assessor</u>, 3 N.E.3d 49, 53-54 (Ind. Tax Ct. 2014) (internal footnotes and citations omitted).

As the certified administrative record reveals, the DuSablons' evidence indicated that there were four residential properties – three in their township and one in a neighboring township – that apparently were assessed, and therefore taxed, at a lower percentage of market value-in-exchange than their property. (<u>See</u> Cert. Admin. R. at 39, 49, 51, 53.) While this evidence is no doubt relevant, the Indiana Board did not err in determining that those four properties were insufficient to demonstrate that the DuSablons' property was assessed and taxed at a level <u>that exceeded the common level within their township overall</u>. Accordingly, the Court will not reverse the Indiana Board's final determination on this basis.

**CONCLUSION**

The Court understands that the DuSablons are frustrated with how the property tax system has worked and that they believe their complaints have fallen upon deaf ears. Nonetheless, they have not shown that their assessment of $364,300 was improper. The Court therefore AFFIRMS, in its entirety, the Indiana Board's final determination.